MINUTEMAN, INC., Plaintiff-Appellant-Petitioner,

v.

L.D. ALEXANDER, George Cash, and Amity, Inc., Defendants-Respondents.

Supreme Court

*No. 86–2248. Argued October 4, 1988.—Decided February 1, 1989.*

(Also reported in 434 N.W.2d 773.)

For the plaintiff-appellant-petitioner there were briefs by *Anthony R. Varda* and *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.,* Madison, and oral argument by *Mr. Varda.*

For the defendants-respondents there was a brief and oral argument by *Robert W. Aagaard,* Madison.

DAY, J. This is a review of an unpublished opinion by the court of appeals which affirmed in part and reversed in part a decision by the circuit court for Dane county, Honorable P. Charles Jones, judge. The circuit court denied a motion for a temporary injunction against L.D. Alexander, George Cash, and Amity, Inc., (Defendants) on behalf of Minuteman, Inc. (Minuteman). Minuteman alleged the Defendants had misappropriated trade secrets and computer data. Minuteman sought the temporary injunction to prevent the Defendants from using these materials. The court of appeals reversed the circuit court's determination on one of the trade secrets and remanded the issue to the circuit court. On all other questions, the court of appeals affirmed the circuit court's conclusions. We affirm in part and reverse in part the court of appeals' decision and remand to the circuit court for further proceedings not inconsistent with this opinion.

The basic question to be answered in this review is: what is the proper test for determining what is a "trade secret?" The answer is to be found in sec. 134.90, Stats. We do find, however, that our holding in *Corroon & Black v. Hosch,* 109 Wis. 2d 290, 325 N.W.2d 883 (1982), still provides helpful guidance in determining what are trade secrets under sec. 134.90.

Several other issues are raised: (A) (1) What remedy, if any, is available if a trade secret is improperly acquired, but not subsequently used, by a wrongful taker? We conclude that under section 134.90(2)(a), Stats., an improper acquisition is enough to constitute a misappropriation of a trade secret, and therefore, all remedies in sec. 134.90 are available. (2) What effect, if any, does the possibility of reverse

engineering[1] the chemical formula of a trade secret have on remedies available under sec. 134.90? We hold the possibility of reverse engineering is not enough to prevent a temporary injunction from being issued, but rather should be considered when determining the length of the temporary injunction.

(B) What is the trade secret status of customer lists and lists of persons who have made inquiries as a result of a businesses' advertisements? We conclude these lists may be eligible for trade secret protection under sec. 134.90, Stats.

(C) Did the circuit court abuse its discretion by refusing to grant a temporary injunction against the use of allegedly misappropriated computer data in violation of sec. 943.70(2), Stats., of the criminal code? We conclude that because the circuit court articulated acceptable reasons as stated in *Werner v. A.L. Groofemaat & Sons, Inc.,* 80 Wis. 2d 513, 519, 259 N.W.2d 310 (1977), for refusing to issue the temporary injunction, it did not abuse its discretion.

Minuteman and Amity, Inc., (Amity) are both engaged in the furniture stripping business. Both sell products to people in the furniture restoration business, usually small enterprises. Chemicals, tubs for dipping the furniture, and other related products are sold to customers mostly from catalogs. Their products are essentially the same and both companies consider the other a direct competitor.

This case arises out of events occurring during March and April of 1986. Some facts are in dispute. In March, 1986, Defendants L.D. Alexander (Alexander) and George Cash (Cash) were employed by Minute-

---

[1]"Reverse engineering" is "starting with a known product and working backward to find the method by which [the item] was developed." Note, 1985 Wis. Act 236, sec. 6.

man. Alexander was vice president and general manager. Cash was the vice president in charge of Research and Development. Both were employees at will and had not signed any form of non-competition or non-disclosure agreement with Minuteman.

In late March, Alexander and Cash met with Jerry Cook, president of Amity. It is unclear what was discussed, but Minuteman alleged that Alexander and Cash discussed the possibility of leaving Minuteman to join Amity.

On April 7, 1986, the president of Minuteman, Jim Gauthier (Gauthier), returned from a two week vacation. Upon his return to work he was allegedly met by Alexander and Cash who gave him their immediate resignations. Gauthier stated he did not take the two seriously and told them to take that day off.

On the morning of April 8, Alexander was observed removing boxes of materials from Minuteman's premises. Shortly thereafter, Minuteman allegedly discovered both Cash's and Alexander's work stations completely empty of normal business materials. Minuteman claimed it was unable to locate various business related items. They thought Cash and Alexander had taken the materials.

Several days later, Alexander and Cash began working for Amity. Immediately thereafter, Minuteman filed a complaint against the Defendants. Minuteman claimed numerous causes of action against the Defendants, four of which are the subject of this review. The first allegation claimed the Defendants had misappropriated the trade secret formula for Minuteman's Stripper '76 (formula). The second allegation claimed the Defendants had misappropriated a list of inquiries made in response to Minuteman's

advertisements (Inquiry list). The third allegation claimed the Defendants had misappropriated a list of Minuteman's customers which included information about what and how much each customer had ordered (Customer list). The fourth allegation claimed the Defendants had misappropriated various computer data from Minuteman. None of the items involved were protected by trademarks or patents.

Minuteman requested relief in the form of monetary damages, a temporary restraining order, and a temporary injunction against the Defendants. Although Amity did not concede the allegations contained in the complaint, it did, however, stipulate to the temporary restraining order.

A three day hearing was later held on the matter which included conflicting testimony about what happened. There was testimony about Cash's and Alexander's behavior just before they left Minuteman. In early March 1986, Alexander had requested a printout of the entire Inquiry list. Alexander told Minuteman's computer operator he needed the list for promotional reasons. A complete printout of the list had never been prepared for anyone before, nor had there ever been a complete printed copy of the list routinely maintained in the office. There was also testimony that Minuteman took some security measures to protect the contents of the list from being known by those outside the company. The list was provided to Alexander because of his executive position within Minuteman. After Alexander left Minuteman, it is claimed the list was never found.

There was also testimony that in early April of 1986, Cash had contacted one of Minuteman's two suppliers of Stripper '76. Cash asked for a copy of the formula of Stripper '76 and the supplier complied. The

■■■■■■■■■■

supplier had a record that it had sent the formula directly to Cash, but Minuteman claimed it never found the formula in its files. Cash admitted contacting the supplier for the formula, but said he did so at the request of Gauthier and that he left it on Gauthier's desk when he quit. Minuteman's second supplier of Stripper '76 testified that he considered the formula a trade secret and that he would not have disclosed it to Cash. There was evidence that other steps were taken to keep the formula a secret. There was also testimony that Stripper '76 could possibly be reverse engineered and that the elements of Stripper '76 could have been analyzed to discover its ingredients.

Minuteman asserted additional computer data assigned to Cash and Alexander by Minuteman were also discovered missing, including a recent printout of the Customer list.

A list of Amity's business solicitation mailings made by Cash and Alexander, on April 16 and 17, 1986, was also introduced into evidence. Minuteman argued this list was based on the Customer and Inquiry lists allegedly taken by Cash and Alexander. Minuteman's computer manager testified that the list was in the same sequence as Minuteman's Customer and Inquiry lists and that Minuteman's lists were the sources of Amity's list. Both Minuteman's and Amity's lists were basically in the same zip code order with some random additions in Amity's list. There were also similar mistakes in spelling and addressing on each list. Alexander stated he had written a list for his personal use while he was at Minuteman and used this personal list as the basis for the Amity mailings.

At the circuit court's request, the parties agreed to pay for a report from a Professor Vaughan of the

University of Wisconsin, a court appointed expert. Professor Vaughan examined Stripper '76 and Amity's equivalent furniture stripper. The circuit court stated that Professor Vaughan found no evidence that Stripper '76 had been used to develop Amity's equivalent stripper. The report, however, was never introduced into evidence at the hearing, never made a part of the record, nor did Professor Vaughan testify at the hearing. Furthermore, the court of appeals noted that counsel for Minuteman claimed he never saw the report. The report is a fugitive document.

The circuit court issued a memorandum decision. On the first allegation, the circuit court ruled that the formula for Stripper '76 was a trade secret under sec. 134.90, Stats. (1985).[2] It found the formula had economic value and reasonable efforts were made to maintain its secrecy. It also found that Cash obtained the formula without the permission of Minuteman. However, it found the formula had not been used by Amity, allegedly basing its conclusion on Professor Vaughan's report which was not in evidence. The circuit court refused Minuteman's request for injunctive relief because Amity had not used the formula. The circuit court further concluded that the formula could probably be reverse engineered and that Minuteman could effectively monitor changes in Amity's formulas without the injunction. The injunction was

[2]Although the events complained of occurred before the enactment of the Act creating sec. 134.90, Stats., section 14 of 1985 Wisconsin Act 236 provided for the application of sec. 134.90 to "continuing misappropriation of a trade secret which begins prior to, on or after the effective date of this [Uniform Trade Secrets Act] section." The effective date of 1985 Wisconsin Act 236 was April 24, 1986.

found to be an unnecessary and unduly burdensome remedy.

On the second and third allegations, the circuit court ruled Amity had used the Inquiry and Customer lists but the lists were not protected trade secrets because they failed to satisfy the six part test of the 4 *Restatement (First) of Torts,* sec. 757 (comment b) (1939), as required by *Corroon & Black,* 109 Wis. 2d at 295. The circuit court also ruled that injunctive relief was inappropriate for Minuteman's fourth allegation of computer data misappropriation. Minuteman appealed to the court of appeals.

In an unpublished decision, the court of appeals affirmed in part, reversed in part, and remanded the case to the circuit court. The court of appeals reversed the circuit court's conclusion on the first allegation concerning the formula for Stripper '76. The court of appeals found the circuit court's reliance on Professor Vaughan's report was error because the report was not part of the record. The court of appeals further found no evidence that the formula could be reverse engineered.

The court of appeals, however, affirmed the circuit court's ruling on the second and third allegations that the Customer and Inquiry lists were not trade secrets. The court of appeals also applied the six factor *Restatement* test and held the circuit court had correctly found the lists lacking the required elements. The court of appeals also affirmed the circuit court's decision to refuse to issue a temporary injunction for Minuteman's fourth allegation of computer data misappropriation. Minuteman then petitioned this court for review.

The first question is: what is the proper test for determining what is a trade secret? In *Corroon &*

*Black,* this court established the definition of trade secret based on the 4 *Restatement (First) of Torts,* sec. 757.

> In discussing the definition of a trade secret, we quoted with approval the following language from Restatement, 4 Torts, sec. 757, comment b (1939): Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Corroon & Black,* 109 Wis. 2d at 295 (citations omitted). This court required that all six of the *Restatement* elements be met before the material could be defined as a trade secret. *Id.,* 109 Wis. 2d at 297.

In 1986, however, the legislature passed the Wisconsin version of the Uniform Trade Secret Act (UTSA). Section 134.90, Stats., created a new definition of trade secret as well as establishing possible remedies available to those injured by trade secret misappropriation. The basic question before this court is how the passage of the UTSA affects this court's decision in *Corroon & Black,* and what is the current definition of "trade secret" in Wisconsin.

Section 134.90(6), Stats., states:

> **Uniform trade secrets act.... (6)** Effect on other laws... (a) Except as provided in par. (b),[3] this section displaces conflicting tort law, restitutionary law and any other law of this state providing a civil remedy for misappropriation of a trade secret.

The test established in *Corroon & Black* is therefore no longer the legal standard.

The new definition of trade secret is found in sec. 134.90(1)(c), Stats., which states:

> **Uniform trade secrets act....** (c) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> 1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> 2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

The Commissioners of the Uniform Laws Commission who drafted the UTSA, as well as our legislature, noted "[t]hat the definition of 'trade secret' contains a

---

[3]Section 134.90(6)(b), Stats., is not applicable to this case. It provides:

> **Uniform trade secrets act....** (6) Effect on other laws.... (b) This section does not affect any of the following:
>
> 1. Any contractual remedy, whether or not based upon misappropriation of a trade secret.
>
> 2. Any civil remedy not based upon misappropriation of a trade secret.
>
> 3. Any criminal remedy, whether or not based upon misappropriation of a trade secret.

reasonable departure from the *Restatement of Torts* (first) definition which required that a trade secret be 'continuously used in one's business.'" 1985 Wis. Act. 236, sec. 6, comment; *Uniform Trade Secrets Act,* sec. I, comment, 14 U.L.A. 543 (1985).

We still find, however, the *Restatement*'s definition helpful. The *Restatement* was the basic source of the UTSA's definition of trade secret. Klitzke, *The Uniform Trade Secrets Act,* 64 Marq. L. Rev. 277, 285–86 (1980). In addition, the UTSA's Comments state it "codifies the results of the better reasoned cases concerning the remedies for trade secret misappropriation." 1985 Wis. Act. 236, Prefatory Note; *Uniform Trade Secrets Act,* sec. I, comment, 14 U.L.A. 543 (1985). We hold that although all six elements of the *Restatement's* test are no longer required, the *Restatement* requirements still provide helpful guidance in deciding whether certain materials are trade secrets under our new definition. *See* R. Milgrim, *Milgrim on Trade Secrets,* sec. 201[1] (1987).

The construction of a statute or the application of a statute to a particular set of facts is a question of law. *Bucyrus-Erie Co. v. ILHR Dept.,* 90 Wis. 2d 408, 417, 280 N.W.2d 142 (1979). This court decides questions of law without deference to the circuit court's determination. *Ball v. Dist. No. 4, Area Bd. of Vocational, Technical & Adult Education,* 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984). This court, however, accepts the circuit court's findings of fact unless they are clearly erroneous. Section 805.17(2), Stats.

When examining an alleged violation of sec. 134.90, Stats., three questions arise. First, whether the material complained about is a trade secret under sec.

134.90(1)(c), Stats. Second, whether a misappropriation has occurred in violation of sec. 134.90(2). And finally, if both of the above requirements are met, what type of relief is appropriate under sec. 134.90(3) or (4). *See also Electro-Craft Corp. v. Controlled Motion, Inc.,* 332 N.W.2d 890 (Minn. 1983) (same analysis is followed).

## A. *STRIPPER '76 FORMULA:*

As to Minuteman's first allegation, both the circuit court and court of appeals determined that the formula for Stripper '76 is a trade secret. The Defendants do not challenge this finding. What is in contention is whether the Defendants misappropriated the formula, and if so, what type of relief should be granted to Minuteman.

The circuit court found that "Cash obtained the formula without permission" but that there was insufficient evidence that it was turned over to Amity. Section 134.90(2), Stats., defines misappropriation as:

> **Uniform trade secrets act....** **(2)** Misappropriation. No person, including the state, may misappropriate or threaten to misappropriate a trade secret by doing any of the following:

> (a) Acquiring the trade secret of another by means which the person knows or has reason to know constitute improper means....

The circuit court's finding that "Cash obtained the formula without permission" constitutes an "improper means" as defined in sec. 134.90(1)(a), Stats.[4]

---

[4]Section 134.90(1)(a), Stats., provides:

**Uniform trade secrets act. (1)** Definitions. In this section: (a) "Improper means" includes espionage, theft, bribery, misrepre-

The circuit court acknowledges that this section "may have been violated by Cash in obtaining the formula." The circuit court held, however, that sec. 134.90(2)(b) also had to be violated. We disagree. The statute only requires a violation of one of the subsections. It states "any of the following" will constitute a misappropriation of a trade secret. *See also Uniform Trade Secret Act,* sec. 1, 14 U.L.A. 1988 pocket part 332 (1985).

The final question of this first allegation is what type of relief is Minuteman entitled to receive. The circuit court denied the issuance of a temporary injunction because the formula could be discovered by reverse engineering. The court of appeals found the circuit court had erroneously relied on material not in the record for its conclusion. The court of appeals remanded this question back to the circuit court. We affirm the court of appeals' decision on this issue.

This court notes, however, that the *possibility* of reverse engineering is not enough to deny a temporary injunction as the circuit court had held. The Commissioners' comments to the UTSA note that discovery by reverse engineering is a proper means to discover a trade secret. Note, 1985 Wis. Act. 236, sec. 6.

The *possibility* of reverse engineering a trade secret, however, is not a factor in determining whether an item is a trade secret, but rather it is a factor in deciding how long the injunctive relief should last:

> The general principle of section 2(a) and (b) is that an injunction should last for as long as is necessary, but no longer than is necessary, to eliminate

sentation and breach or inducement of a breach of duty to maintain secrecy.

the commercial advantage of "lead time" with respect to good faith competitors that a person has obtained through misappropriation. Subject to any additional period of restraint necessary to negate lead time, an injunction accordingly should terminate when a former trade secret becomes either generally known to good faith competitors or generally knowable to them because of the lawful availability of products that can be reverse engineered to reveal a trade secret.

For example, assume that A has a valuable trade secret of which B and C, the other industry members, are originally unaware. If B subsequently misappropriates the trade secret and is enjoined from use, but C later lawfully reverse engineers the trade secret, the injunction restraining B is subject to termination as soon as B's lead time has been dissipated. All of the persons who could derive economic value from use of the information are now aware of it, and there is no longer a trade secret under section 1(4). It would be anti-competitive to continue to restrain B after any lead time that B had derived from misappropriation had been removed.

Commissioners' Comments, *Uniform Trade Secrets Act,* sec. 2, 14 U.L.A. 544–45 (1985).

If the trade secret could have been independently developed or discovered by reverse engineering or otherwise, the maximum appropriate duration of the injunction would be that amount of time which the misappropriator would have needed to discover the trade secret using "proper means." In most cases, the amount of lead time that the defendant would have taken is debatable. A comparison can be made of the time taken by other competitors to

develop the trade secret independently, if one or more of them had done so.

Klitzke, *Uniform Trade Secrets Act,* 64 Marq. L. Rev. 277, 302–03 (1980).

**B.** *THE CUSTOMER AND INQUIRY LISTS:*

Although the lists are distinct, both the circuit court and the court of appeals decided the second and third allegations in a similar fashion. Both courts interpreted sec. 134.90, Stats., as still embodying the trade secret definition in *Corroon* which required all six factors of the *Restatement* test be met before a trade secret could be found. As discussed above, the *Corroon* test no longer embodies the definition of trade secret. We, therefore, reverse the court of appeals' decision and remand for further determination using the statutory definition in sec. 134.90.

Some customer lists are afforded protection under the UTSA:

> This is not to say that every customer list would be denied trade secret status under the uniform act. We are well aware, for example, ... that in certain sectors of the business community identical or nearly identical products and/or services are sold to a small, fixed group of purchasers. In such an intensely purchaser-oriented market, a supplier's customer list could well constitute a trade secret.

*Steenhoven v. College Life Ins. Co. of Am.,* 460 N.E.2d 973, 974, n. 5 (Ind. Ct. App. 1984).

In *Kozuch v. CRA-MAR Video Center, Inc.,* 478 N.E.2d 110 (Ind. Ct. App. 1985), the customer list of a video rental club was found to constitute a trade secret under the Indiana version of the UTSA. An injunction was permitted to stop the use of the

misappropriated trade secret. Others have noted the possibility of trade secret protection for Customer Lists under the UTSA. *See American Paper & Packing Products, Inc. v. Kirgan,* 183 Cal. App. 3d, 1318, 1324, 228 Cal. Rptr. 713 (1986); Klitzke, *The Uniform Trade Secret Act,* 64 Marq. L. Rev. 277, 285 (1980). Decisions by other jurisdictions on questions involving the UTSA are to be given careful consideration by the courts in Wisconsin. Section 134.90(7), Stats.[5]

The court of appeals is reversed on this issue and the cause is remanded for an inquiry as to whether the lists are trade secrets as defined in sec. 134.90, Stats.

## C. *COMPUTER DATA:*

Minuteman also challenges the decision of the court of appeals because Minuteman asserts both lower courts erred in their determinations on the fourth allegation of computer data misappropriation. Minuteman argues that the Defendants have violated sec. 943.70(2), Stats.,[6] with their alleged misappropria-

---

[5]Section 134.90(7), Stats., provides:

**Uniform trade secrets act....** (7) Uniformity of application and construction. This section shall be applied and construed to make uniform the law relating to misappropriation of trade secrets among states enacting substantially identical laws.

[6]Section 943.70(2), Stats., provides:

**Computer crimes....** (2) Offenses against computer data and programs (a) Whoever wilfully, knowingly and without authorization does any of the following may be penalized as provided in par. (b):

1. Modifies data, computer programs or supporting documentation.

2. Destroys data, computer programs or supporting documentation.

tion of Minuteman's computer data. The circuit court found Minuteman's "evidence at the hearing fails to support the broad, conclusionary accusations" of the other alleged acts. The circuit court stated that even if the allegations could be supported by the evidence, damages represented an adequate remedy at law (relying on *Forest Laboratories, Inc. v. Formulations, Inc.*, 299 F. Supp. 202, 211 (E.D. Wis. 1969)). Injunctive relief was therefore ruled inappropriate. The court of appeals affirmed the circuit court on this issue and we agree.

The denial of a temporary injunction is a matter of discretion of the circuit court. The sole issue on appeal is whether the circuit court abused its discretion. *Werner v. A.L. Grootemaat & Sons, Inc.*, 80 Wis. 2d 513, 519, 259 N.W.2d 310 (1977). The circuit court found that Minuteman would not suffer irreparable harm and that damages represented an adequate remedy at law. In addition, the circuit court concluded that Minuteman had not established a reasonable probability of success on its fourth allegation. These are all satisfactory reasons for denying a temporary injunction. *Id.* 80 Wis. 2d at 520. Minuteman has failed to show the circuit court abused its discretion. We, therefore, affirm the court of appeals on this issue.

---

3. Accesses data, computer programs or supporting documentation.

4. Takes possession of data, computer programs or supporting documentation.

5. Copies data, computer programs or supporting documentations.

6. Discloses restricted access codes or other restricted access information to unauthorized persons.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part and the cause is remanded for further proceedings not inconsistent with this opinion.